H. C. BLASSINGAME, Appellant,

v.

**HALLIBURTON OIL WELL CEMENTING COMPANY, Inc., Appellee.**

No. 3398.

Court of Civil Appeals of Texas.

Eastland.

Oct. 3, 1958.

Dell & Perry Barber, Colorado City, for appellant.

Scarborough, Black & Tarpley, Abilene, for appellee.

GRISSOM, Chief Justice.

H. C. Blassingame, Sr., as next friend for his eighteen year old son, H. C. Blassingame, Jr., sued A. O. Wellman & Sons, Ted Weiner, Paul DeCleva, Texas Crude Company, Texas Crude Oil Company and Halliburton Oil Well Cementing Company, Inc., for damages caused by an injury to H. C. Blassingame, Jr., in an explosion at a plugged oil well on the Blassingame farm. He alleged that the "operators" pronounced the well a dry hole and twice purported to plug it; that in the first attempt the "operators" employed Halliburton to do the plugging and it acted as agent for the defendant "operators"; that said operators pulled the casing and made a second attempt to plug the well about April 3, 1954; that they employed C. E. Knight and Company to remove the casing and then plug the well and in so doing Knight and Company acted as agent of said operators; that defendants knew the well was producing large quantities of gas and air and had the duty to plug it in such manner as would prevent gas and air from escaping; that in attempting to plug the well they were guilty of negligence in (1) failing to plug it; (2) failing to plug it so as to prevent gas and air from escaping; (3) in failing to fill the well with rock, sediment or mortar composed of suitable material, in violation of Vernon's Ann.Civ.St. Article 6005; (4) in failing to plug the well before drawing the casing so as to prevent gas from escaping, in violation of said article; (5) in failing to plug the well so as to confine the gas, oil and water to the strata in which they were found, in violation of Article

6029(2); (6) in attempting to plug the well without complying with directions of the Railroad Commission; (7) in exploding shots of nitro-glycerine in said well when removing casing therefrom, after the first plugging operations had been completed; (8) in not welding the steel cap on top of the surface casing; (9) in not securing the steel cap so as to prevent gas and air from escaping; (10) in failing to inspect the well after drawing the casing and the second plugging operation to see if gas and air were escaping and (11) in failing to place signs near the well warning plaintiff that it might blow out.

The depositions of Blassingame, Sr., and Jr., and Weiner and DeCleva and Pendleton were taken. Plaintiff relied upon the res ipsa loquitur doctrine to establish the negligence of Halliburton. Halliburton made the depositions a part of a motion for summary judgment, alleged there was no controverted issue of fact as to negligence of Halliburton or that any act or omission of Halliburton proximately caused the minor's injury and that said minor's contributory negligence was a proximate cause of his injury and barred his recovery as a matter of law. The court sustained said motion and entered judgment for Halliburton and plaintiff has appealed.

In several points plaintiff contends, in effect, that the depositions raised issues of fact as to Halliburton's negligence and that it was a proximate cause of the minor's injury and as to the minor's contributory negligence.

Texas Crude Company and Texas Crude Oil Company had charge of the drilling and employed O'Neal Drilling Company to drill the well. Halliburton was employed by the "operators" to put in cement plugs at 7,770 feet and 7,960 feet and to put in a cast iron plug at 2,200 feet. Knight and Company was employed to pull the casing and plug the well according to the Railroad Commission's directions. Halliburton's plugging operations were done January 29th and 30th, 1954. Knight and Company

did its plugging on April the 3rd or 4th, 1954. There was evidence that the only pressure encountered in drilling the well was between 800 and 1,000 feet. After Halliburton rendered its service, a metal dome was affixed to the top of the well. In its center was a small metal square which could be turned with a wrench. On the day the minor was injured, J. Hooks, an employee of D. S. & R. Company, came to the well site with a bull dozer to clean up. The minor and Hooks went to the well, obtained a wrench and, after Blassingame, Sr., had arrived the three of them decided to open the valve with a wrench and check the pressure in the well. Hooks partly opened the valve and there was a loud roar as air escaped. Hooks closed the valve. Blassingame, Sr., testified that when Hooks opened the valve it made so much noise "you couldn't hear anything"; that Hooks left it open for half a minute and then closed it; that he noticed the pressure before it was closed; that about twenty or thirty minutes after Hooks closed the valve, he, Blassingame, Sr., turned the valve; they talked about the pressure and how nice it would be if they could use it; that when Blassingame, Sr., turned the valve he left it on for about the same length of time that Hooks had; that he turned it on a little more than Hooks and the sound was louder; that about the time Hooks went back to his bull dozer, a Mr. Robertson, who farmed an adjoining tract of land and worked in oil fields, drove up and suggested they open the valve. The minor said he went to his tractor and got a wrench and gave it to Robertson and he and his father and Robertson agreed to again open the valve. Blassingame, Sr., testified that he went to the minor's tractor and got the wrench; that, before Robertson turned it on, Blassingame, Sr., told him he had turned it on before Robertson arrived and about the pressure; that Robertson opened the valve more than Blassingame, Sr., had; that no one raised any objection; that when it was turned on this time the noise was very loud; that it could have "blowed four minutes"; that after three or four

minutes it began to "ease off" to where they could hear each other; that they then walked back to the well, thinking the pressure was down; that it appeared to start up again and they walked to the edge "and it had changed from air to kind of a bluish gray gas" that you could see; that Robertson put his hand on the valve and got a yellow oil stain on his hand and showed it to Blassingame, Sr.; that they then "looked into the hole and then she blew"; that he didn't know whether Robertson had cut off the valve or not. Blassingame, Sr., testified that his son had walked to the north side and was picking up ice caused by something from the well when there was a noise like a dynamite blast and drilling mud, rotary mud and hard pieces of concrete came out of the well and the metal plate on top of the well was blown north about 110 feet. Blassingame, Sr., testified:

"Q. —what purpose did you all have in opening the valve there? A. Just to see whether there was any danger in it or not, I guess."

He further testified that nobody knew about the air until "we opened the valve"; that he had not complained about the plugging job before the explosion; that he didn't then know it hadn't been done right; that the steel plate plug was on top of the well a month or two before the explosion; that during the time the plugging operations were going on he didn't see anybody down there but "Knight's people"; that Knight was the one who pulled the casing and plugged the well.

H. C. Blassingame, Jr., testified that he was at the well when Knight was shooting the casing; that he didn't see any of the plugging except the last done by Knight; that Knight had not started plugging when he left the well site on a Sunday afternoon, but the next time he was there they had a dome shaped thing on it and the next time they had a steel plate on it; that there was a 13 inch casing in the top of the well covered by a dome shaped cap with a two and a half inch pipe sticking out of the top and on top of the pipe was a valve with a handle on it; that he visited the well site every week or two after he saw the steel cap on the 13 inch pipe, he later saw it covered by the steel plate with the valve; that the valve was just a square thing that "we put the wrench on"; that it was probably where a handle had been but they had taken the handle off; that you had to have a wrench to open the valve; that after a rain, water stood on the cap and you could see air coming up around the plate where it was welded; that he visited the well twenty or twenty-five times after the steel plate was put on; that his head was about a foot from the plate when it exploded; that Mr. Hooks worked for the D. S. & R. outfit and he was out there to clean up; that he didn't think the well was a dry hole; that he thought it was a producer; that he and Hooks talked about it being a producer instead of a dry hole after his father reached the well site shortly before the explosion and that his father and Hooks talked about twenty or thirty minutes; that his father told Hooks about the air pressure and how it had shot salt water out; that when Hooks and his father were there they talked about seeing what the pressure was and they decided to check the pressure by opening the valve; that the open end of the valve was to the north where the minor stood and the pressure came out of the open end of the valve; that it made a roaring, whistling noise; that it wasn't smoky like it was later when Robertson opened the valve; that they shut it off because they were afraid it might start blowing salt water; that when Robertson came up they just talked about air pressure and Robertson said:

"A. —'Let's just open it up and see how long it will blow', so I went to my tractor, got a wrench out and gave it to Charles and he opened it up and we all stepped back.

"Q. Whose idea was it for you to get the wrench? A. When Charles said 'Let's open it', I said I had a

wrench in my tractor that would fit it."

The minor further testified that when he handed Robertson the wrench Robertson "asked us if he ought, and we told him to go ahead and he turned it on and when it started making so much noise, he climbed out of the cellar.

"Q. When you handed him the wrench he started to, and then there was some conversation as to whether you ought or not? A. Yes, sir, mostly about whether there was any danger.

"Q. And who said you should? A. I don't know, we just all agreed that it would not hurt anything.

"Q. You all agreed to take the chance, more or less? A. Yes, sir."

Ted Weiner testified by deposition that he did business as Texas Crude Company and Texas Crude Oil Company and in his own name; that Texas Crude Company was composed of certain members of the Weiner family and Texas Crude Oil Company was a partnership composed of fewer of the same family; that Texas Crude Oil Company supervised the drilling of the Blassingame well and Callaway was its superintendent in charge of drilling; that he and Nickles Company, a Boston group, and Snowden, DeCleva and Cornell, were partners in drilling the well.

Paul DeCleva testified by deposition that he and his associates named by Mr. Weiner had the well drilled by O'Neal Drilling Company; that under their agreement Weiner had the duty of plugging the well.

Appellant contends in his second point that, having pleaded res ipsa loquitur and the case being a proper one for application of that doctrine, the negligence of Halliburton should be presumed, there being no evidence to the contrary in the depositions. His statement thereunder is in part as follows:

"Operators A. O. Wellman & Sons, Paul DeCleva, Ted Weiner, Texas Crude and Texas Crude Oil Company, drilled the well on plaintiff's land under a farm out agreement from Cities Service Oil Company, and had made two attempts to plug said well, the first plugging operation having been performed by Appellee, Halliburton Oil Well Cementing Company, and the second plugging operation having been performed some time later by C. E. Knight & Company. The well had been drilled out in the middle of plaintiff's field, and on the day the well blew out plaintiff's minor son, H. C. Blassingame, Jr., was plowing there in the field near the well site. Some time after the second plugging operation, the operators had welded a steel cap on top of the surface casing of the well, which had a valve on it which could be opened with a wrench. There was a boarded in cellar surrounding the well about 3 or 4 feet square and 3 or 4 feet deep, and the surface casing extended up above the surface of the ground for several feet but not above the top of the cellar."

This statement is followed by details of what the Blassingames, Hooks and Robertson did just before the explosion. In conclusion, appellant, in applying the law to the facts, says that the defendant "operators" drilled the well and purported to plug it; that the law imposed a duty on them to plug it in a certain manner, "which obviously they did not do or it would not have blown out." He then asks:

"What caused the well to blow out? Which one of the defendants committed the negligent acts or omissions which caused the well to blow out and injure plaintiff's minor son? Plaintiff does not know, and certainly there is no way he can find out."

"Certainly this is a classic example of a situation where evidence to explain the occurrence was more readily accessible to the defendants than to the plaintiff. It might well be argued

that defendants had control of the well at the time it blew out because they had not finished their job. At the very time the well blew out, Jay Hooks, an employee of D. S. & R. Construction Company hired by defendants to do the cleanup work around the well, was there operating a bull dozer, and and Mr. Callaway, Superintendent of the Texas Crude and Texas Crude Oil Companies, testified that they left the steel cap with the plug in it on the well because they had not made their final inspection. In any event, it certainly cannot be doubted that the defendants (either one or all of them) had control of the instrumentality which caused the injury (the well) at the time the negligent acts or omissions were committed which eventually caused the well to blow out, and under the Texas authorities cited above, this is all that is required to invoke the doctrine of res ipsa loquitur in Texas."

Finally, appellant says that since the well would not have blown out in the absence of negligence on the part of the defendants, the doctrine of res ipsa loquitur applied to Halliburton and the court erred in rendering summary judgment for it.

Halliburton replies that the doctrine is not applicable to it because (1) appellant has not shown that this is the type of accident which ordinarily does not occur in the absence of negligence; (2) the pleading and evidence failed to negative the reasonable probability that the minor's injury resulted from some negligent act of appellant or from some cause other than the negligence of appellee and (3) the instrumentality causing the injury was not under the exclusive control of appellee.

 We think the applicable rule was laid down by our Supreme Court in Texas & Pacific Coal Co. v. Kowsikowski, 103 Tex. 173, 125 S.W. 3, 4, when it said:

"The derailment of the car, unexplained, is a fact which by its very nature may be admitted to suggest something amiss, a want of proper precaution somewhere. But what was the cause of the derailment? Until we can answer that question, we think it must be admitted that it is not shown by the evidence that the particular thing which caused this injury was in the exclusive management of the defendant. If everything that could reasonably be assigned as the cause of the derailment had been wholly under the control of servants of defendant other than the deceased himself, it might be inferred that the cause, whatever it was, consisted in some negligent act or omission of theirs. But we have a track, with its switches, and a motor car, defects in, or negligent management of, any of which might have brought about that which happened. The deceased himself had a hand in the management of the switches, and also in controlling the movements of the car, in so far as it depended on the giving of signals. Negligence is not to be imputed either to him or to the defendant's other servants without proof; and a state of facts in which the cause of the accident cannot be found does not warrant a conclusion that one, rather than the other produced it. We cannot presume in favor of one and against the other. Evidence must be brought by a plaintiff, having the burden of proof, sufficient to justify an inference of negligence on the part of the defendant, and none such can be drawn from an occurrence which, while indicating negligence somewhere, is as consistent with the hypothesis that it was his own, or that of one in whose right he sues, as that it was that of the other party. * * *

"Again it is said that the defendant was in a position to clear away all these doubts. This consideration has force where a plaintiff has proved a state of facts which, while not free from question, is yet sufficient, in the

absence of explanation, to give rise to an inference of negligence on the part of the defendant. But it has no application where the facts shown are equally consistent, as they are in this case, with all these hypotheses, viz., that the injury was caused (1) by the negligence of deceased, or (2) by that of defendant, or (3) by that of both deceased and defendant. 6 Thompson on Neg. § 7698 and cases cited. The defendant certainly is not called upon to account for the conduct of the deceased."

Said rule was again stated by our Supreme Court in Davis v. Castile, Tex.Com.App., 257 S.W. 870, 872, as follows:

"* * * where the evidence shows that the accident may have happened as the result of one of two or more causes, and it is not more reasonably probable that it was due to the negligence of the defendant than to any other cause, the rule of res ipsa loquitur does not apply."

In Bonner v. Texas Co., 5 Cir., 89 F.2d 291, 294, the court said:

"Res ipsa loquitur does not help, for that doctrine applies only when the instrumentalities causing the injury are shown to have been wholly in the care of defendant, and not to have been meddled with by the person injured or outsiders."

See also Johnson v. Texas & P. Ry. Co., Tex.Civ.App., 117 S.W.2d 864 (Writ Dis.); 26 Tex.Law Review 263; 27 Tex.Law Review 355; 35 Tex.Law Review·15; 30 Tex.Jur. 806; 169 A.L.R. 969; 65 C.J.S. Negligence § 220(8), p. 1014; Leroy v. Texas Gulf Sulphur Co., Tex.Civ.App., 309 S.W.2d·550, 552; Portilla Drilling Co. v. Miller, Tex.Civ.App., 144 S.W.2d 936 (D.J.C.); Simmons v. Perkins, Tex.Civ. App., 193 S.W.2d 737, 738; McBride v. Paluxy Asphalt Co., Tex.Civ.App., 164 S.W.2d 32; Alexander v. Cheek, Tex.Civ.

App., 241 S.W.2d 950; Tuscany v. United States Standard Products Co., Tex.Civ. App., 243 S.W.2d 207; Bonner v. Thompson, Tex.Civ.App., 205 S.W.2d 610 (Writ Ref.); Benkendorfer v. Garrett, Tex.Civ.App., 143 S.W.2d 1020 (D.J.C.); Ward v. Wallace, Tex.Civ.App., 175 S.W.2d 611 (Ref.W.M.) and Honea v. Coca Cola Bottling Co., 143 Tex. 272, 183 S.W.2d 968, 160 A.L.R. 1445.

 We are forced to the conclusion that no inference of Halliburton's negligence can be drawn from the testimony of the Blassingames or any other witness. Therefore, the res ipsa loquitur doctrine is not applicable. Assuming that all the evidence favorable to the plaintiff is true, it cannot be said that it is more probable that the injury was caused by the negligence of Halliburton than any other cause.

The judgment is affirmed.

WALTER, J., disqualified and not sitting.